**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DIGITAL DIAGNOSTICS INC., | CASE NO. _____ |
| *Plaintiff*, | |
| v. | **JURY TRIAL DEMANDED** |
| JUSTIN WHITE | |
| *Defendant*. | |

**VERIFIED COMPLAINT**

Plaintiff Digital Diagnostics Inc. ("DDx") brings the following complaint against Justin White ("White" or "Defendant").

**NATURE OF THE ACTION**

1.      DDx is a pioneer in the healthcare industry.  Its autonomous artificial intelligence ("AI") diagnostic system is the first of its kind and has revolutionized medical providers' ability to diagnose eye disease accurately, efficiently, and equitably.  Convincing providers to trust and adopt such transformative technology is often challenging, and DDx has spent years developing and refining detailed and innovative commercialization and sales strategies, which have allowed DDx to establish, grow, and maintain a lead market position, even as other AI developers rush to catch up.

2.      DDx files this lawsuit because its former sales employee Justin White has thrown DDx's years of work into jeopardy.  On the morning of August 5, the same morning he was informed that his employment would be terminated due to sales performance issues, White stole hundreds of DDx's most sensitive confidential and trade secret documents by copying them to an external hard drive.  Within weeks, White had exploited DDx's trade secret documents to land a management position with DDx's direct competitor, AEYE Health, Inc. ("AEYE").  White also

took hard copies of DDx's confidential and trade secret information related to its sales and go-to-market strategies, in breach of his contractual and fiduciary obligations.

3.      Upon uncovering evidence of White's theft, DDx moved quickly to confront White with this evidence in correspondence on October 4.  White responded days later and while he did not deny that he had taken DDx's trade secret documents, he insisted he had never shared them with AEYE, and never accessed the information after August 5.  White then produced his external hard drive for inspection on October 16, and again represented in writing on October 17 that he had not accessed, transferred, or deleted any DDx trade secrets information since August 5 (the day he was fired from DDx).  The forensic evidence, however, from White's hard drive that DDx received on October 18 shows these statements are false.  Contrary to his written representations, White repeatedly accessed (and very likely copied) DDx's most confidential and trade secret information on his external hard drive across multiple days in September, *after* he had joined AEYE.

4.      Faced with White's ongoing misappropriation and deception, DDx has run out of options, and thus seeks immediate redress from this Court.  This is a civil action for damages and preliminary and permanent injunctive relief for violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq.*; the Iowa Uniform Trade Secrets Act, I.C.A. § 550, *et seq.*; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*; breach of contract; breach of fiduciary duty; and conversion.

## THE PARTIES

5.      DDx is a Delaware corporation with its principal place of business in Coralville, Iowa.  DDx is a healthcare technology company that designs, builds, and implements autonomous AI systems that can diagnose disease, as described below.

6.    On information and belief, Justin White is a United States citizen who resides in California, with his place of residence at 12722 Kristi Lynn Ct., Eastvale, CA 92880.

## JURISDICTION AND VENUE

7.    This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because DDx asserts claims for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*

8.    This Court has supplemental jurisdiction over DDx's remaining claims pursuant to 28 U.S.C. § 1367(a) because such claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy.

9.    This Court has personal jurisdiction over White, and venue is proper in this District, because the parties contractually agreed as much.  In the Confidentiality, Intellectual Property and Non-Solicitation Agreement for U.S. Employees ("PIIA," Exhibit A) between White and DDx, White expressly agreed that "any and all litigation between DDx and me relating to this Agreement will take place exclusively in Delaware and I consent to the jurisdiction of the federal and/or state courts of that state. I consent to personal jurisdiction and venue in both such Courts and to service of process by United States Mail or express courier service in any such action."  As described below, this litigation relates to the PIIA.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**A.    DDx's Groundbreaking Work with AI**

10.    Artificial intelligence (AI) is transforming the healthcare industry.  AI has immense potential to improve patient outcomes, lower costs, and accelerate medical discoveries.  In recent years, AI has been applied in the field of medical diagnoses, where data sets can be used to train machine learning models to identify indicators of disease that have been commonly identified in

the medical community. These machine learning models, once properly trained, can then be used to read and interpret data from medical images to detect signs of disease or degeneration.

11.     Recognizing the immense potential of AI applications, Dr. Michael Abramoff founded DDx in 2010 with the goal of harnessing autonomous AI to improve diagnostic capabilities.  In his decades of practice as an ophthalmologist and retina specialist, Dr. Abramoff saw countless patients suffering from diabetic retinopathy (DR), often at stages already too advanced to permit optimal treatment.  Over 35 million people in the U.S. are living with diabetes and are at risk of going blind from DR.  Using AI led by Dr. Abramoff, DDx sought to create solutions that help increase access, reduce costs, and improve the quality of care for patients at risk for DR and other conditions.

12.     Armed with decades of research and practice experience, Dr. Abramoff and his team at DDx set out to build a first-of-its-kind AI system that could harness the capabilities of AI to *autonomously* diagnose diseases such as DR by analyzing high-quality retinal scans.  This work required more than $100 million in financing capital and nearly a decade of research and clinical trial activity to obtain FDA clearance and commercialize the technology.

13.     DDx's work finally came to fruition in April 2018, when DDx became the first company to receive FDA clearance for an autonomous AI product that could accurately diagnose DR without needing a physician to review the images.  This first-of-its-kind autonomous AI platform is called the LumineticsCore point-of-care diagnostic system ("LumineticsCore").



14.    Using a fundus camera (pictured above), the trained operator captures two images per eye.  These images are then submitted to LumineticsCore, which uses AI to analyze the images for signs of DR and quickly provides results at the point of care.  If disease is detected, the patient is referred to an eye care professional right away, which increases the chances of follow-through. If no disease is detected, the patient is advised to get re-tested in 12 months.  In a clinical trial, LumineticsCore helped patients avoid 91% of unnecessary specialty visits by providing a diagnostic result that is negative for diabetic retinopathy (including macular edema) at the point of care.

15.    By using AI to autonomously diagnose DR, LumineticsCore helps increase patient access to care, lowers costs, and improves provider efficiency by bringing diagnostic results to the patient, referring only those patients that need follow-up care and eliminating unnecessary additional appointments. This enables providers to meet a quality measure that is tied to their payment arrangements with payors.  And it was one of the reasons, in addition to the nearly 10

years Abramoff spent working with payors, government agencies, medical societies and patient organizations, why LumineticsCore became the first product to ever obtain autonomous AI CPT reimbursement from the Centers for Medicare & Medicaid Services (CMS).

16.    Currently, LumineticsCore is in use at hundreds of locations in the United States.

**B.    DDx's Security Measures to Protect its Proprietary Information**

17.    As discussed above, LumineticsCore is the first software of its kind.  Other companies, seeing LumineticsCore's success and potential, have rushed to enter the AI diagnostic industry and to follow in DDx's footsteps.  Accordingly, DDx's immense work to develop AI for diagnostic applications, obtain the necessary regulatory approvals and federal and state reimbursement, and successfully establish commercial relationships with customers has enormous value in this nascent industry.

18.    In addition to its massive investment in product development, regulatory approvals, and clinical trials, DDx has also spent significant time and resources optimizing its sales and marketing strategies.  Convincing healthcare providers to trust a novel technology like LumineticsCore—let alone use it—presents unique challenges not faced by traditional medical device or pharmaceutical manufacturers.  So, through years of trial and error, DDx has developed detailed proprietary strategies for how to prospect, market, sell, and implement its software, as well as how to get customers to understand and effectively utilize LumineticsCore once they enter into a contract with DDx.

19.    As more competitors enter the market (following the roadmap provided through DDx's FDA clearance), these proprietary sales strategies become ever more critical to DDx's ability to maintain its leading market share.  They are, in essence, DDx's "keys to the shop."

20.     Given the competitive nature of the industry and the lengths to which competitors will go to gain a foothold, DDx employs a variety of methods to protect its confidential information and trade secrets.  Several examples of these security measures are described in the following paragraphs.

21.     **IT Security Measures:** DDx uses a variety of electronic security measures to protect its proprietary information.  For example:

- Every DDx employee must use two-factor authentication (2FA) at least once a month to access DDx's file management systems;

- DDx requires strong password protection for all DDx-owned devices and accounts;.

- DDx divides its file-sharing system (Microsoft's Sharepoint) into multiple sites, and access to each site requires permissions granted by the site's owner, which are restricted to employees with a need to know; and

- DDx passively monitors the electronic activities of its employees on DDx's system, and this system generates alerts if it detects any unusual activity that is indicative of a security breach.

22.     **Employee Agreements:** Each DDx employee must sign a confidentiality agreement as a condition of their employment.  Every confidentiality agreement (like the PIIA) includes provisions prohibiting the use or disclosure of DDx's confidential information outside of the employee's work for DDx.  The agreements also require the employees to return DDx's confidential information and property upon the conclusion of employment, and to inform DDx of any new employment within the ensuing 12 months.

23.     **IT Security and Confidentiality Policies:**  DDx emphasizes employees' confidentiality obligations through a confidentiality policy in its employee handbook, which

underscores that "[n]o organization record and information, including documents, files, records, computer files, or similar materials may be removed from Company devices either in paper or electronic form."  In addition, DDx maintains and enforces a comprehensive Information Security Management Policy.  That policy provides for various physical, technical, and administrative safeguards for DDx's confidential information, including that:

- DDx will assign access authorization based on the roles and responsibilities of each employee;

- DDx prohibits access to certain sensitive data from mobile or personal devices;

- Business associates and contractors must be screened and provide satisfactory assurances that they will appropriately safeguard certain sensitive information;

- All components of DDx's information system will be housed in physically secure locations; and

- DDx will conduct regular risk assessments, vulnerability scans, and audits to ensure the security of its information.

24.     These policies apply to every DDx employee.  Each DDx employee must undergo a yearly security awareness training pursuant to the Information Security Management policy.

25.     **Non-Disclosure Agreements (NDAs):** Before exchanging any proprietary information with customers (such as proposals, pricing information, or contracts), DDx requires those customers to execute an NDA that governs the use of any DDx confidential information the customer receives.  Customer agreements expressly forbid DDx's customers from providing DDx's diagnostic reports or other confidential information to any DDx competitor.

**C.    DDx's Employment of Justin White**

26.    In January 2022, DDx hired White as a National Account Executive.  In his role as a National Account Executive, White was responsible for using DDx's proprietary sales and marketing strategies to develop, grow, and maintain customer relationships.  This included locating sales leads, meeting with prospective customers, pitching LumineticsCore (and other DDx products), negotiating customer contracts, and working with customers to expand and renew their LumineticsCore subscriptions.  This position required extensive knowledge not only of DDx's product capabilities, but also of DDx's commercial and sales strategies.

27.    During his employment with DDx, White often accessed and used DDx's valuable trade secret and confidential and proprietary information, including but not limited to:

    a.    internal marketing plans for LumineticsCore and other DDx products,

    b.    step-by-step sales guides, including detailed outlines for how to most effectively communicate the value of AI diagnostic software,

    c.    historical sales data and trends,

    d.    DDx's strategic plans, including anticipated market challenges and DDx's strategies to overcome those challenges,

    e.    workflow and product implementation guides,

    f.    customer and prospect lists,

    g.    copies of contracts and contract templates (including redlines with explanatory comments),

    h.    diagnostic reports, step-by-step customer user guides, and customer training materials,

    i.    internal white papers and case studies for LumineticsCore and other DDx products,

    j.    DDx's billing and coding guidance and reimbursement factsheet,

    k.    maps of DDx's reimbursement target states,

    l.    internal reimbursement FAQs,

m. cost comparisons and other documents highlighting the benefits of LumineticsCore compared to market alternatives, and

n. interface screenshots for DDx's software for LumineticsCore and other DDx products.

(collectively, the "Trade Secret Information"). The Trade Secret Information is unique and valuable, and is not generally known to or readily ascertainable by others outside of DDx.

28.    Throughout his employment with DDx, White worked remotely from his home in Eastvale, California. As a DDx employee, White was subject to each of the security measures described above designed to protect the Trade Secret Information (*supra* I.B). Consistent with these requirements, as a condition of his employment, White executed a Confidentiality, Intellectual Property and Non-Solicitation Agreement for U.S. Employees on January 30, 2022 ("PIIA").

29.    Section 5 of the PIIA deals with "Confidential Information and Property." In that section, White promised as follows:

**5.1 Non-disclosure of Confidential Information.** I recognize that Confidential Information is of great value to DDx, that DDx has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including any entity that competes with DDx, will cause immediate irreparable injury to DDx. Unless I first secure DDx's written consent, I will not disclose, use, disseminate, identify by topic or subject, lecture upon or publish Confidential Information. I understand and agree that my obligations not to disclose, use, disseminate, identify by subject or topic, lecture upon or publish Confidential Information shall continue after the termination of my employment for any reason.

**5.2 Return of Information and Materials.** Upon termination of my employment with DDx for any reason whatsoever, or at any time requested by DDx, I will immediately return to DDx any and all Confidential Information and any and all information and material relating to DDx's business, products, personnel, suppliers or customers, whether or not such material is deemed to be confidential or proprietary. Thereafter, any continued possession will be deemed to be unauthorized. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information stored in any electronic form) relating in any way to the affairs of DDx and which were entrusted to me or obtained by me at any time during my employment with DDx.

10

**5.3 Return of DDx Property.** Upon termination of my employment with DDx for any reason whatsoever, or at any time requested by DDx, I will return to DDx any and all property in my possession which belongs to DDx, including the following: all keys and security and credit cards; all equipment, products, samples, inventory, tools, computers, software, cell phones and other electronic devices; all customer files, account files, price lists, product information, training manuals, promotional materials and handbooks; and all other documents relating to DDx's business, products, personnel, suppliers and customers.

Ex. A at §§ 5.1-5.3.

30.    The PIIA defines "Confidential Information" as:

know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by me, disclosed to me or developed by me during my employment with DDx, including, but not limited to (a) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (b) information concerning DDx's customers, clients, referral sources and vendors, and potential customers, clients, referral sources and vendors, including, but not limited to, names of these entities or their employees or representatives, preferences, needs or requirements, purchasing or sales histories, or other customer or client-specific information; (c) supplier and distributor lists; (d) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (e) products, product development work, product know-how, product technology and product development strategies and plans; (f) employees, personnel or payroll records or information; (g) forecasts, budgets and other non-public financial information; (h) acquisitions, divestitures, expansion plans, management policies and other business strategies; (i) algorithms, formulae, inventions, research, development, manufacturing, purchasing, finance processes, technologies, machines, computer software, software code, computer hardware, automated systems, methods, engineering, marketing, merchandising, and selling; and (j) information belonging to third parties which has been disclosed to DDx in confidence.

Ex. A at § 2.2.

31.    The PIIA also included a provision regarding any work White performed for a new employer: "To enable DDx to monitor my compliance with the obligations imposed by this Agreement, I agree to notify DDx in writing before I commence employment with a new employer of i) the identity of my new employer (if any) and ii) of my job title and responsibilities, and will continue to so inform DDx, in writing, any time I accept or change employment during the Restricted Period. I shall provide this notice to the human resource lead for DDx." *Id.* at § 6.5.

The "Restricted Period" was the twelve-month period following the termination of White's employment with DDx. *Id.* at § 2.8.

32.     White expressly agreed that the PIIA's protections are "reasonable and necessary for the protection of the goodwill and continued business of DDx," and that "DDx will suffer irreparable injury, loss, harm and damage if I engage in conduct prohibited in this Agreement." *Id.* at § 7.6.  Accordingly, White acknowledged that "DDx is entitled to specific performance and injunctive relief in addition to money damages at law without the posting of a bond if I breach or threaten to breach this Agreement;" and that DDx could recover its reasonable attorney's fees and costs in any successful action "for my breach or threatened breach of this Agreement." *Id.* at § 8.1.

33.     The PIIA also included a forum-selection clause, in which White agreed that "any and all litigation between DDx and me relating to this Agreement will take place exclusively in Delaware and I consent to the jurisdiction of the federal and/or state courts of that state. I consent to personal jurisdiction and venue in both such Courts and to service of process by United States Mail or express courier service in any such action." *Id.* at § 8.2.

34.     These covenants in the PIIA continued beyond the termination of White's employment. *Id.* at § 8.6.  White's covenants identified above were in effect while he worked for DDx and remain in effect today.

35.     In January 2024, as part of his employment, DDx gave White the Digital Diagnostics LumineticsCore Sales Binder ("Sales Binder").  The Sales Binder contained extensive confidential information and trade secrets regarding DDx's business and sales practices, which would be of significant interest and benefit to DDx's competitors.

**D.      White's Misappropriation of DDx's Trade Secrets**

36.      While DDx had high hopes for White as a member of its sales team, White did not hold up his end of the bargain.  White consistently failed to meet DDx's sales quotas, despite being given multiple opportunities to improve his performance.   Indeed, in the weeks leading up to August 5, White's supervisor participated in several meetings with White to discuss White's lackluster performance and consistent failures to meet his sales targets.  White's performance failed to improve.  For these reasons, DDx ended White's employment on the morning of August 5, 2024.

37.      Consistent with DDx's policies, in exchange for a severance payment, White executed a Confidential Separation and Release Agreement ("Release Agreement").   In the Release Agreement, White acknowledged and agreed to comply with the terms of the PIIA, including the provisions requiring the return of any property owned by DDx.

38.      As part of his termination, White also received DDx's "Team Member Offboarding Frequently Asked Questions" ("Offboarding Instructions" (Exhibit B).) The Offboarding Instructions again reminded White that "[a]ll Digital Diagnostics property is to be returned within five (5) days from your last day of employment."  Ex. B at 2.

39.      Despite DDx's reminders about the PIIA and White's acceptance of the severance payment, he had no intention of complying with the PIIA.  Instead, DDx has learned that when he signed the Release Agreement, White had already stolen DDx's most sensitive confidential information and trade secrets, which he surreptitiously copied to an external hard drive on the morning he learned his DDx employment was ending.  Rather than return that information as the PIIA required, White intended to leverage these trade secrets to obtain employment with a direct DDx competitor and use DDx's information on that competitor's behalf.

40.    As part of his employment with DDx, White used a DDx-owned laptop (the "DDx laptop").  As required by the PIIA and the Release Agreement, White returned the DDx laptop to DDx on or about August 12, 2024.

41.    White, however, did not return a hard copy of the Sales Binder containing extensive amounts of DDx's confidential information and trade secrets that DDx provided him during the course of his DDx employment.  He also failed to return the external hard drive to which he had secretly copied hundreds of DDx's most confidential information and trade secret documents on the day he learned his DDx employment was ending.

42.    DDx eventually learned that White had become employed with AEYE Health, Inc. ("AEYE"), a direct competitor, in mid-September 2024.  White's failure to alert DDx to his employment with AEYE (as required by the PIIA) and his continued failure to return the hard copy Sales Binder caused DDx significant concern that White could be sharing its information with or exploiting its information on behalf of AEYE.  Accordingly, DDx retained a computer forensics expert to examine the DDx laptop that White had returned and to review White's electronic activities on DDx's systems.

43.     To DDx's dismay and immediate concern, this investigation uncovered extensive evidence that White violated and continues to violate the PIIA, and that he intentionally accessed and copied extensive amounts of the Trade Secret Information on the same morning that he was let go from DDx.

44.    On the morning of August 5 when his employment ended, White surreptitiously pilfered hundreds (if not more) of DDx's most confidential and trade secret documents so he could obtain subsequent employment with a direct DDx competitor and use DDx's information on such a competitor's behalf.

45.    At approximately 9:13 am, as shown in the attached declaration by J. Christopher Racich (Exhibit C), White attached an iOmega Hard Drive, bearing serial number 801130168383 (the "White Hard Drive") to the DDx laptop. Ex. C at ¶ 11. From 9:15 am to 9:18 am, White created *at least* the following folders on the White Hard Drive:

- D:\Digital Diagnostics\Attachments

- D:\Digital Diagnostics\Apps

- D:\Digital Diagnostics\Microsoft Team Chat Files

- D:\Digital Diagnostics\Recordings

- D:\Digital Diagnostics\Documents

- D:\Digital Diagnostics\Pictures

- D:\Digital Diagnostics\Desktops

*Id.* at ¶ 14.

46.    At the same time, and again immediately after attaching the White Hard Drive to the DDx laptop, White accessed 555 files over a 17-minute period (from 9:13 am to 9:30 am), including spreadsheets, word documents, PowerPoint presentations, PDFs, and other files. *Id*. at ¶ 13. Many of these files include DDx's Trade Secret Information. In fact, the folder paths on the White Hard Drive were each created at almost the exact same moment that White was accessing files in these same folder paths on the DDx laptop. DDx's later review of the White Hard Drive proves that White copied each of these 555 files from the DDx laptop to the White Hard Drive (*supra* paragraphs 76-77).

47.    White had no legitimate reason to access and copy these files on the morning that he learned of his termination. The only explanation for White's behavior is that White was

pilfering DDx's most sensitive confidential information and trade secrets to benefit DDx's competitors and undermine DDx's competitive advantages.

48.    White's surreptitious copying of DDx's Trade Secret Information did not stop on August 5.  Over the next two days until he returned the DDx laptop, White continued to secretly access and copy more Trade Secret Information.   On August 7, he accessed another 16 files from the DDx laptop.   Ex. C at ¶ 13.   These files included DDx's customer list and a proprietary spreadsheet containing a draft tool to demonstrate the overall value of LumineticsCore to DDx's customers.

49.    All told, over these three days, White accessed at least 571 files—files that DDx's competitors would need to mimic DDx's go-to-market strategy and successful sales tactics, preempt DDx's sales pitches, undercut the terms and conditions under which DDx contracts with customers, copy DDx's customer integration expertise, and undermine DDx in the marketplace. As just a few examples, the Trade Secret Information files that White copied included the following:

- A proprietary draft tool quantifying the potential economic value potential customers may experience through the use of DDx's diagnostic software;

- "Sales Toolkit.pptx," a "soup to nuts" sales presentation that guides DDx sales representatives through all aspects of DDx's proprietary sales process, including how to locate prospects, how to pitch LumineticsCore, and how to follow through to successfully close deals;

- "Pitch Assets - Sales Team.pptx," a presentation that includes detailed descriptions of how DDx delivers results reporting directly to a customer's electronic health record ("EHR") management system (a challenge that many of DDx's competitors

struggle with), and information about various customer EHR systems and how DDx integrates with those systems;

- "Overview of Implementation.pptx," a presentation outlining step-by-step procedures for helping customers implement LumineticsCore successfully (another significant challenge for DDx's competitors);

- "IDx-DR Screen Slides V3.7.pptx," a confidential Powerpoint with detailed instructions on how to perform an exam using LumineticsCore (protected from disclosure by customer NDAs);

- Customer contracts, contract templates, and contract redlines;

- Lists of customer contacts, leads, and event attendees; and

- "Cost of Initial Examination of Diabetic Retinopathy 20200812.pdf," a detailed analysis of the costs of traditional DR exams to permit comparison with AI tools.

50.    Even then, White felt he needed more confidential information to ensure he could efficiently topple DDx. After his meeting with DDx HR where he was informed that his employment was ending, White downloaded DDx's full confidential customer contact list from DDx's Zendesk Sell platform, as shown in the screenshot below:



51.    These customer contacts are also Trade Secret Information, because DDx has invested enormous resources to build its customer base.  DDx does not share its customer list with anyone outside of the company, and the list would be extremely valuable to DDx's competitors including because it provides a roadmap to healthcare organizations that have evaluated and become early adopters of autonomous AI diagnostic technology.

52.    On August 7, 2024, White used the DDx laptop to search for competitive jobs where he could leverage the Trade Secret Information he had stolen.  For example, White's Google Chrome history indicates that he was researching potential opportunities on the LinkedIn page for Eyenuk, Inc., a DDx competitor.  Ex. C at ¶ 19.

53.    Then, in an apparent attempt to cover his tracks, White cleared the browser history for the Chrome web browser on his DDx laptop on August 7.  Ex. C at ¶ 16.

54.    White's possession of both the Sales Binder and the Trade Secret Information in the copied files following his discharge on the morning of August 5 was never authorized by DDx.

**E.    White's Deception and Ongoing Use of the Trade Secret Information to Benefit AEYE**

55.    As described above, the Trade Secret Information has enormous value to DDx—provided DDx protects that information from its competitors.  One of those competitors is AEYE, an Israeli company that claims to provide a "1-minute AI diabetic eye exam at any point of care."

56.    Although AEYE directly competes with DDx, AEYE's sales have significantly lagged behind DDx.  Indeed, AEYE did not receive FDA approval for its "AI diagnosis solution" until August 2023, more than five years after the FDA approved LumineticsCore for the diagnosis of DR.

57.    After obtaining FDA clearance, AEYE has gained little commercial traction or market share in the United States.  Given this lack of revenue traction, the sales and marketing strategies in the Trade Secret Information White stole are *exactly* what AEYE needs, but currently lacks.  Obtaining those industry-leading go-to-market and sales strategies would allow AEYE to jump start its sales, undermine DDx's market share, and unfairly benefit from the years of effort and millions of dollars that it took DDx to develop its successful practices.

58.    This fact was not lost on White when DDx fired him.  In fact, by mid-September, within six weeks of his termination from DDx, White had landed a position as AEYE's Regional Sales Manager.  On information and belief, White's new role with AEYE is highly similar to the role he previously held at DDx.

59.    As discussed above, White's sales performance at DDx was poor, and he consistently missed all sales quotas.  Thus, White's value to AEYE is not in his sales prowess or general industry expertise.  Rather, on information and belief, White has convinced AEYE that he can add value by short-circuiting the years-long go-to-market, sales development, and

implementation process that DDx has so painstakingly honed, using the vast amounts of Trade Secret Information he secretly took.

60.    Despite the obligations in the PIIA, White never informed DDx of his new employment with AEYE.  And rather than come clean about the extent of his misappropriation, White has instead repeatedly lied to DDx about his ongoing possession and use of the DDx Trade Secret Information.

61.    On October 4, 2024, promptly after receiving the initial results of the forensic investigation of the DDx laptop, DDx sent White a cease & desist letter (the "C&D Letter") by email through its outside counsel.  A copy of the C&D Letter is attached as Exhibit D.

62.    In the C&D Letter, DDx informed White that it knew White had deliberately accessed and copied extensive amounts of DDx's confidential information and trade secrets after his termination.  DDx demanded that White (1) immediately cease and desist from any further violations of his contractual and legal obligations to DDx, (2) return the Sales Binder to DDx by October 8, (3) preserve and segregate any electronic devices or cloud-based accounts that contain DDx information and present them for third party forensic examination by close of business on October 8, and (4) execute a sworn statement providing an accounting of each instance since August 5 where White has shared DDx information with another individual or entity or used it on behalf of another individual or entity.  Ex. D at 3.

63.    On October 8, 2024, White responded to the C&D Letter by email.  White informed DDx's counsel that he had shipped the Sales Binder, but ignored all of DDx's other demands, including the demand that White arrange to return all the electronic information he had stolen. (Exhibit E (Email to Counsel).)

64.     Notably, White said nothing about the White Hard Drive he had surreptitiously attached to the DDx laptop, and conspicuously failed to deny that he had stolen and continued to retain DDx's Trade Secret Information.  White offered no explanation for his behavior, and refused to even acknowledge DDx's preservation demand.  Unfortunately, White's cagey response on October 4 was only the beginning of his obfuscation.

65.     On October 4, DDx also sent a copy of the C&D Letter and the PIIA to AEYE. (Exhibit F.)  DDx warned AEYE to preserve all potentially discoverable and relevant information and devices, including all AEYE electronic devices to which White had attached the White Hard Drive.

66.     AEYE's CEO confirmed receipt of the letter and indicated that he would "personally get back to [DDx] in the coming days."  On October 9, AEYE's CEO responded that AEYE had "no intention of making use of any confidential information of [DDx]," that it had conducted an "internal investigation," and that AEYE was not aware of "any data from [DDx] . . . that was brought to [AEYE] by [White] (or being used by him)."  The CEO also said AEYE had discussed DDx's letter with White and he had denied any wrongdoing.  Notably, however, the CEO's communication said nothing about the White Hard Drive, and did not acknowledge DDx's preservation demand.

67.     On the evening of October 11, White sent another letter to DDx by email through his outside counsel (the "10/11/24 Response"), attached as Exhibit G.  In the 10/11/24 Response, White acknowledged that he had both an external hard drive, and two thumb drives, which White claimed were not connected to any computer "since [White's] termination" and "are currently being sequestered and will not be utilized in any way pending resolution of this matter."  This October 11 letter proved to be the first of several outright falsehoods from White.

68.     Notably, the 10/11/24 Response did not deny that White copied DDx's confidential and trade secret information to the White Hard Drive without DDx's authorization after White's employment had ended, that he continued to possess DDx's confidential and trade secret information, or that he worked for AEYE in a directly competitive position to his role at DDx.

69.     The 10/11/24 Response stated that White "is agreeable to having these computer media forensically examined (subject to a mutually acceptable forensic protocol to protect his private and privileged information contained thereon) and should they be determined to contain any information belonging to DDx, to have same permanently deleted therefrom."  Ex. G.  The 10/11/24 Response further stated that White was willing to provide a sworn statement confirming all of the representations in the 10/11/24 Response.

70.     Based on the representations in the 10/11/24 Response and the October 9 representations from AEYE's CEO, DDx elected to pursue White's offer to provide the devices referenced in the 10/11/24 Response.  DDx counsel communicated with White's counsel via e-mail on Sunday, October 13, and via telephone call on the morning of Monday, October 14.  During that call, White's counsel reiterated his offer to provide the devices for forensics examination and his initial understanding that White had not attached the White Hard Drive to any computer or other devices after August 5.

71.     On October 16, after negotiating a forensics protocol, White's counsel shipped the White Hard Drive, as well as two thumb drives, to DDx's forensic consultant for examination.

72.     As detailed below, that forensics examination revealed that statements made in the 10/11/24 Response are demonstrably false.  White, in fact, had accessed the White Hard Drive on multiple occasions after August 5 and, even worse, after his AEYE employment had begun.

73.    Even before DDx received the initial results of the forensics examination of the DDx laptop, White's counsel began to backtrack.  On October 17, White's counsel told DDx's counsel by email that White had in fact attached the White Hard Drive to a laptop computer in September 2024 (Exhibit H).

74.    The October 17 email states that White purchased a new laptop in late September (approximately one and a half months after the August 12th return of the DDx laptop), and that he connected the White Hard Drive to his new laptop at that time. Ex. H.  The email, however, insists that "Mr. White *did not access, transfer or delete any DDx confidential data* that resided on the [White Hard Drive].  Further, in the time period between Mr. White returning the DDx-issued laptop and him purchasing his new laptop, the [White Hard Drive] was not connected to any other computer or media, *nor was any DDx confidential data thereon accessed, transferred or deleted*." *Id.* (emphasis added).

75.    Like White's previous representations, the October 17 email quickly proved to be false. Ex. C at ¶¶ 20-21, 23.  Less than a day later, White and DDx received the initial results of the forensic inspection of the White Hard Drive, which confirmed that White stole Trade Secret Information on the morning of August 5 by copying them to the White Hard Drive. Even more troubling, the White Hard Drive showed that White had ***accessed numerous files (potentially all of the files containing Trade Secret Information) on at least September 12, 2024 and again on September 30, 2024*** in a manner highly indicating that they not only had been accessed but also had been copied and/or otherwise exported to another device or to a cloud-based location.

76.    First, the forensic report for the White Hard drive confirms that on the morning of August 5, a "Digital Diagnostics" folder (with over 43 sub folders) was created on the White Hard Drive, and 555 DDx files from the DDx laptop were copied to those folders.  Ex. C at ¶ 22.

77.    Alarmingly, it then shows that on September 12—which coincides with the time that White joined AEYE—White accessed several hundred files and folders from within the "Digital Diagnostics" folder on the White Hard Drive, including dozens of files with DDx's Trade Secret Information.  *Id.* at ¶ 23.  As just a few examples, the Trade Secret Information files that White accessed and copied on September 12 included the following:

- "(BLANK) DSA DDx 5.9.22.docx," a confidential customer contract template;

- "2022 GA MA SA Sales  CSM Update.pptx," a presentation that details the structure of DDx's various teams, their key goals, specific states targeted for advocacy and progress made, key details of ongoing real world evidence studies and the participants in those studies, and planned journal submissions;

- A proprietary draft tool quantifying the potential economic value potential customers may experience through the utilization of DDx's diagnostic software;

- Numerous sales presentations for various DDx customers (protected by NDAs), which include workflow diagrams, image results reports from LumineticsCore, and business case considerations; and

- A highly confidential and detailed explanation of the scientific, clinical, and commercial differences between LumineticsCore and a competitor's product.

78.    These accessed files alone—which represent just a small subset of the files last accessed on September 12—contain extremely sensitive Trade Secret Information that would be invaluable to a competitor like AEYE that is trying to catch up to DDx and replicate DDx's sales success.  These files alone would allow AEYE to jump start its sales effort, recreate DDx's sales practices and efforts that have been developed over years of effort and expense, undercut the

contractual terms and conditions under which DDx contracts with customers, and even to undercut DDx's pricing strategies.

79.    All told, on September 12, over the period of roughly an hour, White accessed 235 different files and folders within the highest level "Digital Diagnostics" folder that he originally created on the morning of August 5.  *Id.* at ¶ 23.

80.    Importantly, the forensics examination of the White Hard Drive only could determine that these accessed files and folders were *last* accessed on September 12 from the White Hard Drive.  The relevant registry does not record access between the dates the files were created on the White Hard Drive (August 5) and September 12.  Accordingly, White could have accessed those files and folders on multiple occasions between those two dates.  *Id.* at ¶ 24.  Moreover, if White transferred the files to another device on September 12 (such as his AEYE computer) and later accessed the files again from that device, forensic review of the White Hard Drive would not reflect that access either.

81.    White had no reason to access these stolen DDx files on September 12 unless he was sharing them with AEYE and/or otherwise using the Trade Secret Information on AEYE's behalf.  White certainly was not authorized to possess the Trade Secret Information after his DDx employment ended on August 5, much less access, copy, or share them once he began working for AEYE.

82.    The initial forensics results showed additional access of DDx Trade Secret Information on the White Hard Drive after September 12.  Specifically, on September 30—only three business days before White received DDx's October 4 cease and desist letter—White accessed an additional 22 files and folders within the "Digital Diagnostics" folder on the White

Hard Drive over a four-minute period, including Trade Secret Information concerning sales pitches and revenue calculators.  *Id.* at ¶ 23.

83.     That White accessed several folders in such a short time indicates that he likely copied the entirety of those folders to another device or cloud-based location.  *Id.* ¶ 25.  Again, since the forensics examination only reveals the last date these files and folders were accessed from the White Hard Drive, White could have accessed them on multiple occasions between August 5 and September 30.

84.     Forensic evidence also indicates that a user (most likely White) also opened at least one DDx file on September 30.  Specifically, White navigated to and opened a file called "Macula Society 2021final3_Dr.Folk – Read Only.pptx."  *Id.* ¶ 26.  This document is a presentation, including voiceover recordings, provided to a private scientific group describing the key points of a study that compares the diagnostic value of AI eye exams against other traditional methods for diagnosing eye disease. That White actually clicked and opened this file further underscores the falsity of his representations to DDx, and confirms that he was intentionally and purposefully accessing DDx's information well after he started working at AEYE.

85.     Ultimately, the initial forensics examination of the White Hard Drive showed not only that the various representations from White and his counsel were false, but that White accessed an extensive amount of DDx Trade Secret Information on the White Hard Drive on multiple occasions during his AEYE employment right up until he received DDx's cease and desist letter.  What's more, the access indicates that White was sharing those files and/or copying them to other locations/devices, and doing so to AEYE's benefit and DDx's harm.  Furthermore, based on the statement in the October 17 letter that White did not attach his "new laptop" to the White Hard Drive until late September (roughly a month and a half after he returned the DDx laptop), it

is apparent that White has attached *at least two* different devices to the White Hard Drive since August 5, since the forensic evidence shows that DDx files on the White Hard Drive were last accessed on September 12 and 30th.

86.    The access of the DDx files on the White Hard Drive since White joined AEYE demonstrates that White (and likely AEYE) used and has continued to use the Trade Secret Information that he unlawfully misappropriated from DDx.

87.    Furthermore, on October 2, 2024, White emailed a prospective DDx customer that he serviced for DDx from his AEYE email account.  In his email, White told the DDx customer that "AEYE Health has developed the first AI technology to instantly diagnose diabetic retinopathy on both a desktop and a portable handheld camera," and asked the DDx customer if they would be interested "in a quick discovery call to discuss?"  The customer contact, who had previously communicated with White when he was employed by DDx, responded to White's former DDx email address on October 2, 2024, letting White know that they had forwarded his email to the customer's clinical and data lead.

88.    The initial forensics results from the examination of the White Hard Drive has confirmed DDx's worst fears.  It proves that the repeated representations of White and his counsel cannot be trusted.   White's October 11 and October 17 representations have been proven demonstrably false.  He not only possessed the stolen Trade Secret Information, but accessed it multiple times during his AEYE employment up until just a few days before receiving DDx's October 4 cease and desist letter.

89.    Beyond confirming the falsity of White's representations, the forensics also call into question the October 9 representations of AEYE's CEO.  Contrary to the implication in that representation, White clearly accessed the DDx Trade Secret Information he stole on August 5 on

multiple occasions during his AEYE employment.  Either White also lied to AEYE, or AEYE's CEO's October 9 statements are intentionally false or misleading.

90.    Given White's ongoing possession and use of DDx's Trade Secret Information, his repeated demonstrably false representations to DDx, and the fact that this information is directly relevant to his current responsibilities with AEYE, it is inevitable that White will continue to use and disclose the Trade Secret Information in the course of his work for AEYE.  This is not only due to the competitive nature of White's position, but also because of his demonstrated eagerness to take and misuse the Trade Secret Information.

91.    Meanwhile, White continues to irreparably harm DDx and its market share by unlawfully keeping and using its Trade Secret Information on AEYE's behalf.  And because White has already demonstrated a willingness to lie about his access to and use of the DDx Trade Secret Information, any further "representations" he provides to DDx at this point are worthless.  Only the Court can put a stop to any further harm to DDx.

## COUNT ONE: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT OF 2016

92.    DDx realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93.    DDx possesses highly unique and valuable Trade Secret Information, including but not limited to (i) customer names and contact information, (ii) business strategy documents, (iii) customer contracts and templates, (iv) software & user-interface instructions, (v) sales strategy documents, and (vi) third party analyses.  The Trade Secret Information is confidential, proprietary, not generally known to the public, and constitutes trade secrets within the meaning of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1839 ("DTSA").

94.     DDx uses the Trade Secret Information in interstate commerce.  DDx relies on the Trade Secret Information to work with customers and potential customers all over the United States.  White also received the Trade Secret Information (including the Sales Binder) at his home office in California from DDx's headquarters in Iowa.

95.     DDx has taken reasonable measures to keep the Trade Secret Information secret and confidential, including but not limited to requiring its employees with access to such information to sign binding confidentiality agreements, requiring compliance with IT security policies, requiring passwords and 2FA from employees seeking to access DDx's Trade Secret Information, and requiring customers to sign NDAs before receiving DDx's Trade Secret Information.

96.     The Trade Secret Information has independent economic value because it is not generally known to, and is not readily ascertainable by proper means by persons other than DDx who could obtain economic value from its disclosure or use.

97.     DDx compiled the Trade Secret Information over many years and at great expense.

98.     White, by engaging in and continuing to engage in the conduct and activities described herein, including as described in Paragraphs 36-91, has violated DTSA through his improper acquisition, disclosure and use of the Trade Secret Information, which constitutes actual and threatened misappropriation.  For example, immediately following his termination from DDx, White began accessing DDx's Trade Secret Information and copying it to an external hard drive. White also kept a hard copy of DDx's confidential Sales Binder.

99.     White has used the Trade Secret Information repeatedly since he left DDx to solicit DDx's customers for the benefit of DDx's competitors.  For example, White accessed and copied the Trade Secret Information from his external hard drive on September 12 and September 30

(after joining AEYE).  And on October 2, 2024, White used DDx's Trade Secret Information to contact a DDx customer and used it to solicit business from this customer.

100.    On information and belief, White has successfully stolen customers and/or prospective customers from DDx using the Trade Secret Information.

101.    White had, and continues to have, access to DDx's Trade Secret Information.

102.    Upon information and belief, White has actually used, plans to use, or will inevitably use, the Trade Secret Information on behalf of himself and/or AEYE.  Given the similarities between White's work for DDx and AEYE, and the fact that DDx and AEYE are direct competitors, it is inevitable that White will use and/or disclose DDx trade secrets in his work.

103.    White owed, and continues to owe DDx a duty to maintain the secrecy of the Trade Secret Information.  White knew or had reason to know, and continues to know or have reason to know, of that duty at the time he disclosed or used the Trade Secret Information without DDx's consent.

104.    DDx has demanded that White return the Trade Secret Information and cease and desist from utilizing it for his own or anyone else's benefit.

105.    While White submitted the White Hard Drive for forensic inspection on October 16, the forensic evidence shows that he almost certainly copied the Trade Secret Information to *another* data repository before that date.  And the forensic evidence shows that White has repeatedly lied about his ongoing access to the Trade Secret Information.

106.    As a direct and proximate result of White's violation of DTSA, DDx has sustained substantial damages in an amount that will be established at trial of this matter.

107.    DDx has and will continue to suffer irreparable harm as a result of White's unlawful conduct and the disclosure and misappropriation of DDx's Trade Secret Information. White's

activities are likely to result in a substantial loss of business and market share for DDx, now and in the future.

108.    The actions of White were willful, malicious and intended to injure DDx and its business.

109.    DDx has no adequate remedy at law because White's actions are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

## COUNT TWO: MISAPPROPRIATION OF TRADE SECRETS UNDER THE IOWA UNIFORM TRADE SECRETS ACT

110.    DDx realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

111.    As set forth above in Count 1, DDx possesses highly unique and valuable Trade Secret Information, including but not limited to (i) customer names and contact information, (ii) business strategy documents, (iii) customer contracts and templates, (iv) software & user-interface instructions, (v) sales strategy documents, and (vi) third party analyses.  The Trade Secret Information is confidential, proprietary, not generally known to the public, and constitutes trade secrets within the meaning of the Iowa Uniform Trade Secrets Act, I.C.A § 550, *et seq.*, as amended ("IUTSA").

112.    DDx engaged in efforts that are reasonable under the circumstances to keep the Trade Secret Information secret and confidential, including but not limited to requiring its employees with access to such information to sign binding confidentiality agreements, requiring compliance with IT security policies, requiring passwords and 2FA from employees seeking to access DDx's Trade Secret Information, and requiring customers to sign NDAs before receiving DDx's Trade Secret Information.

113.    The Trade Secret Information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by persons other than DDx who could obtain economic value from its disclosure or use.

114.    DDx compiled its Trade Secret Information over many years and at great expense.

115.    White, by engaging in and continuing to engage in the conduct and activities described herein, including as described in Paragraphs 36-91, has violated IUTSA through his improper acquisition, disclosure and use of DDx's Trade Secret Information, which constitutes actual and threatened misappropriation.  For example, immediately following his termination from DDx, White began accessing DDx's Trade Secret Information and copying it to an external hard drive.  White also kept a hard copy of DDx's confidential Sales Binder.

116.    White has used the Trade Secret Information repeatedly since he left DDx to solicit DDx's customers for the benefit of DDx's competitors.  For example, White accessed and copied the Trade Secret Information from his external hard drive on September 12 and September 30 (after joining AEYE).  And on October 2, 2024, White used DDx's Trade Secret Information to contact a DDx customer and used it to solicit business from this customer.

117.    White had, and continues to have, access to DDx's Trade Secret Information.

118.    Upon information and belief, White has actually used, plans to use, or will inevitably use, additional Trade Secret Information on behalf of himself and/or AEYE.  Given the similarities between White's work for DDx and AEYE and the fact that DDx and AEYE are direct competitors, it is inevitable that White will use and/or disclose the Trade Secret Information in his work for AEYE.

119.    White owed, and continues to owe DDx a duty to maintain the secrecy of its Trade Secret Information.  White knew or had reason to know, and continues to know or have reason to

know, of that duty at the time he disclosed or used DDx's Trade Secret Information without DDx's consent.

120.     While White submitted the White Hard Drive for forensic inspection on October 16, the forensic evidence shows that he almost certainly copied the Trade Secret Information to *another* data repository before that date.   And the forensic evidence shows that White has repeatedly lied about his ongoing access to the Trade Secret Information.

121.     White has failed to return the Trade Secret Information without any appropriate basis.

122.     As a direct and proximate result of White's violation of IUTSA, DDx has sustained substantial damages in an amount that will be established at trial of this matter.   DDx suffered these injuries in Iowa because it is located there.

123.     DDx has and will continue to suffer irreparable harm as a result of White's unlawful conduct and the disclosure and misappropriation of DDx's Trade Secret Information.   White's activities will result in a substantial loss of business for DDx, now and in the future.

124.     White's actions were willful, malicious and intended to injure DDx and its business.

125.     DDx has no adequate remedy at law because White's actions are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

## **COUNT THREE: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**

126.     DDx realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

127.     White's actions described above violate both 18 U.S.C. §1030(a)(4) and (a)(5).

128.    The DDx laptop White used for his work with DDx is a "protected computer" under the Computer Fraud and Abuse Act because it was used to conduct interstate and foreign commerce and communication.

129.    White knowingly, intentionally and without authorization, copied for himself sensitive, confidential and proprietary DDx documents, all in violation of his contractual and other obligations to DDx.

130.    By accessing and copying sensitive, confidential and proprietary information knowing that he no longer worked for DDx and planning to compete against DDx, White knowingly and with intent to defraud accessed documents and/or information without DDx's authorization.

131.    As a result of White's actions, DDx has suffered and will suffer losses in excess of $5,000, including the loss of sensitive, confidential and proprietary information and substantial costs in conducting a computer forensics investigation.

## COUNT FOUR: BREACH OF CONTRACT

132.    DDx realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

133.    The PIIA is an enforceable contract.

134.    DDx fully performed its obligations under the PIIA.

135.    White materially breached one or more provisions of the PIIA, including by (1) refusing to return DDx's Trade Secret Information upon the conclusion of his employment with DDx, (2) continuing to use DDx's Trade Secret Information following the end of his employment with DDx, and (3) failing to notify DDx of his new employment with AEYE.

136.    DDx has been damaged by White's breaches of the PIIA in an amount that will be established at trial of this matter.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY

137.    DDx realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

138.    White owed and continues to owe DDx fiduciary duties, including the duty to maintain the confidentiality of DDx's confidential, proprietary and trade secret information.

139.    White also owed and continues to owe DDx a fiduciary duty to maintain documents and information he created or obtained as a DDx employee for DDx's exclusive use, ownership and benefit.

140.    White has breached his fiduciary duties to DDx by stealing DDx's documents for his personal use and, upon information and belief, for the use of one of DDx's competitors.

141.    As a result of White's breach of his fiduciary duties to DDx, DDx has been and continues to be significantly damaged and has suffered and continues to suffer severe and irreparable harm.

## COUNT SIX: CONVERSION

142.    DDx realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

143.    White is in wrongful possession of DDx's documents and other property, which contain trade secret and other confidential and proprietary information.

144.    White has wrongfully asserted dominion or control over DDx's property in a manner inconsistent with DDx's exclusive ownership and entitlement to such property.

145.    As a direct and proximate result of White's conversion of its property, DDx has suffered and will continue to suffer damages and irreparable harm.

146.    DDx has no adequate remedy at law because White's actions are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

## PRAYER FOR RELIEF

WHEREFORE, DDx seeks the following relief:

1.    An Order requiring White to deliver DDx's documents and other information in White's possession, custody and control to the undersigned counsel within twenty-four (24) hours, together with a signed representation that White has returned all such documents and other information and no longer has any such documents or other information in his possession, custody or control;

2.    An Order requiring White to preserve all information currently stored on his computers, printers, and other electronic storage devices, including any information stored on backup tapes or on iCloud, Google Drive or similar electronic storage methods that may relate in any way to the issues raised in the Complaint;

3.    An Order requiring White to produce all computers and electronic devices to which he attached the White Hard Drive on or after August 5;

4.    An Order requiring White to produce any electronic storage devices and/or accounts that contain DDx's information, including White's personal computer if any DDx information resides on it, to the undersigned counsel;

5.    An Order granting DDx the right to conduct, through reputable experts in the information technology field, an immediate inspection of any electronic devices and/or accounts produced by White that contain DDx information;

36

6.     An Order preliminarily and then permanently requiring that White:

    a.     Comply with his obligations under the PIIA;

    b.     Return to DDx all of its trade secrets and confidential information, as required in the PIIA, including but not limited to, any information copied from DDx's computers or computer networks or other physical property White copied or removed from DDx;

    c.     Identify all persons to whom White has disclosed DDx's trade secrets and other confidential information; and

    d.     Refrain from using or disclosing DDx's trade secrets and other confidential information.

7.     An Order preliminarily and then permanently enjoining White from working for AEYE, or for any other DDx competitor in the field of AI-powered diagnostics for DR.

8.     An Order requiring White to pay DDx's compensatory damages for the actual losses caused by his misappropriation of its trade secrets and other confidential information and other unlawful actions alleged herein;

9.     An Order requiring White to pay DDx punitive damages;

10.     An Order awarding DDx all actual, consequential and exemplary damages to which it is entitled under the law;

11.     An Order requiring White to pay DDx the appropriate pre- and/or post-judgment interests on any award;

12.     An Order requiring White to pay DDx its costs and attorneys' fees for bringing this lawsuit; and

13.     Such other and further relief as this Court may find just and proper under the law.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

CLARK HILL PLC

| | |
|---|---|
| *~of counsel~* | /s/ Margaret M. DiBianca |
| Christopher M. Michalik (*pro hac vice forthcoming*) | Margaret M. DiBianca, Esq. (No. 4539) |
| Heidi E. Siegmund (*pro hac vice forthcoming*) | 824 N. Market Street, Ste. 710 |
| McGuireWoods LLP | Wilmington, DE  19801 |
| Gateway Plaza | Telephone:  302-250-4748 |
| 800 East Canal Street | Email:  mdibianca@clarkhill.com |
| Richmond, VA 23219 | |
| 804-775-1000 | |
| cmichalik@mcguirewoods.com | |
| hsiegmund@mcguirewoods.com | |

Dated:      October 22, 2024                    *Attorneys for Plaintiff*